The final case for argument this morning is 18-2333, Boatmon v. HHS. Yes. The case for argument this morning is 18-2333, Boatmon v. HHS. May it please the Court. This case presents the issue of whether the Court of Federal Claims erroneously held that the Special Master applied a standard of proof so low as to constitute clear error and thus committed a legal error in setting aside the Special Master's factual findings. The Court of Federal Claims concluded that petitioners failed to satisfy Elfin Prong 1 so that necessarily they failed on Prong 2. If we reverse on Prong 1, do we have to consider, are the Prong 2 issues on appeal at this point? I believe Elfin Prong 1 and Elfin Prong 2 are on appeal. So we would have to show Elfin Prong 1 and Prong 2. He did indicate that because we failed on Elfin Prong 1, we also failed on Elfin Prong 2. That was his total analysis of 2. So if we reverse on 1, do we automatically reverse on 2? Or do you need to address other issues? The Special Master found for petitioners for Elfin Prong 1, Elfin Prong 2, all the Elfin Prongs. And I would submit that the Special Master's findings should not have been overturned. And you should affirm the Special Master's findings on Elfin Prong 2. And I don't think that needs to be revisited as well. Under Dr. Miller's theory, any child under 6 months or whatever we're dealing with, receiving a vaccine, irrespective of whether he or she develops a fever in the next 48 hours, if that child tragically dies of SIDS, we 1, assume or accept or presume that that child had a brain stem problem. And 2, that the vaccine caused the SIDS death. Isn't that what Dr. Miller's theory is? I think, first, we have to make sure that we exclude for other causes. And he did say we have to exclude for other causes. And the autopsy, in this case, did exclude other causes. So if the autopsy were to find metabolic abnormalities or something else that could explain the SIDS death, then it wouldn't in that case, yes. That's correct. But if we have other causes, it's not SIDS, right? And SIDS is sort of the unknown cause. Dependent on how severe that abnormality would be. It might be caused by the SIDS. But in the absence of finding another abnormality that would have been found to have caused the death, then automatically the use of the vaccine would be concluded as being the cause of SIDS. I think there's also the question, Dr. Miller's theory embraces the triple risk theory. So in the triple risk theory, you also have to look at other inherent vulnerabilities. So if there's other inherent vulnerabilities in which the evidence is strong that they would predominate, or if there are other exogenous risk factors in other cases, and the evidence in those cases is strong for the other exogenous risk factors, in those cases it could outweigh the vaccine as a potential cause. So in essence, if the infant has those additional risk factors, they're male, they're African American, their parent is a smoker, I mean there's a whole list. Then the special master's analysis was, in that circumstance, I'm going to, using the scientific evidence, make this presumption. I think they can make that presumption. And it's important to understand that SIDS is multifactorial, and the triple risk theory embraces that, that it is multifactorial. And in this case, there were other inherent risk factors demonstrated. He was a male infant, and that's an inherent risk factor, and the special master acknowledged that that probably played a role as well. But there were other risk factors, other exogenous risk factors that he did address, such as race, African American, he was an African American baby. But in the literature, that is typically associated with SIDS due to either poor socioeconomic status or poor health care, which were not present in this case, and he dismissed that as an exogenous risk factor. Dr. Miller's theory, the portion of which, I guess maybe the first step of which, is that a mild, the reason a mild infection is linked to SIDS is because of the neurochemical response to cytokines? Cytokines, yes. Rather than purely mechanical reasons. Correct. Is there some acceptance of this theory in the medical literature or elsewhere? There is, and the petitioners filed several medical articles explaining how SIDS infants with mild or trivial infection, in the literature it's infection or inflammatory process, so it doesn't necessarily have to be a trivial infection, it can be some sort of trivial inflammatory insult, such as a vaccine, and that's explicit in the literature. And these articles do describe infection or the inflammatory insult as a neurochemical risk factor, and they cite to the expression of cytokines in SIDS with mild infection or SIDS infants versus non-SIDS infants in areas of the brain that are responsible for arousal and auto-resuscitation. So in the literature, there is more support in the literature for mild infection or trivial infection or an inflammatory insult as a neurochemical risk factor versus mechanical risk factor. And the respondent's expert, Dr. McCusker, her position was that mild infection can only act as a mechanical risk factor without citing any literature support for that. So there is, and Dr. Miller also has consulted on numerous SIDS autopsies as well and testified that he has never seen an infection operate in that way as a mechanical risk factor or could have been a mechanical risk factor. So the support in this case was, in my opinion, pretty overwhelming that mild infection or inflammatory insults act as a neurochemical risk factor versus mechanical. It seems to me that what the weight of the evidence pointed to, other than a specific result in this case, was potentially an argument that when all these other factors were present, vaccines might need to be given at a later date. That seems to be where both the theories and the testimony were going, is it not? I think that's a reasonable conclusion. I guess I, what does that mean? The risk factors being, so males, African-Americans. First four months. Correct. So that the answer to this is if they're given at a later date, then that alleviates the risk of SIDS. What is that later date? What does the literature say about six months, seven months, eight months? I think it is a reasonable hypothesis. And one of the tenets, one of the three tenets of the Troperous Theory is also a critical developmental period. And that previously had been defined as the first year of life. And after the first, in the vast majority of SIDS infants occurred within that first year of life. As research has gone on and developed, that's kind of impaired down to the first six months of life. Really from two to six months. In a much vast majority, in two to four months. Okay, this is kind of, I guess, important, I think. I mean, the charge here is there's no differentiation. This infant got five or seven shots. I couldn't keep track. But all of these shots, this entire regiment at one time. And you're suggesting that the medical evidence is such that parents should withhold the shots, any of those shots from an indeterminate amount of time beyond six months for every male at least and every American male? I'm not sure where you think the medical science is. I'm not saying that that should be done currently. But if the research were to develop and it was more conclusively shown, then of course I think it should be moved out. What is more conclusively shown? That this was the cause of SIDS, or that the cause of SIDS could be eliminated? I don't think, no. I think, and obviously we're not to that point of scientific certainty, and that's not what we're trying to show in this case. It's one insult among many potentials. Potentially. Potentially, correct. Can I ask about this brainstem abnormality? Sure. Because that's considered a risk factor, but in this case it's kind of a circular thing to me because there was an autopsy done, but this particular infant was not tested. So we don't know, except we assume, so the question answers itself because the child succumbed to SIDS, then we assume that that child had a brainstem abnormality. Is that the way, where the science takes us? Well, I think the important thing is to focus on this case in particular. And the special master looked at several different things in making the determination that JB did in fact have an inherent brainstem abnormality. And you're correct, the autopsy did not show direct evidence of a brainstem abnormality. Did it look? It didn't. That section of the brainstem was not sampled. The brainstem itself was not sampled. And actually, so the evidence in this case that the special master looked at were yes, he did look at the statistical data in the medical literature that 50 to 90% of SIDS infants have been found in the research to have an inherent abnormality. And it's not one abnormality. It could be there are many different abnormalities that have been demonstrated. And they can be structural or functional. So assuming that a brainstem is appropriately sampled, the medical examiner may or may not find a structural abnormality. But if you apply specialized techniques that Dr. Kinney and her colleagues use in the SIDS research, in a great percentage of those cases, functional abnormalities of the brainstem have been found as well. So he looked at the statistical data. In addition, in this case, the special master found that the respondent's expert conceded that JB had a brainstem defect in this case. So that's another thing that he looked at as well. And he also gave credit to the fact that Dr. Miller, his finding is consistent with the methodology employed by Dr. Miller when he's consulting on SIDS autopsies. And he uses Dr. Kinney's literature in his field of practice when he's doing, when he's consulting on SIDS autopsies. What does one make of between 50% and 90%? Different studies. I understood the record here is that the special master concluded. Now, there was a concession by the other side. And I understand it. We'll ask the government about that. But in the absence of a concession, you don't make an assumption that someone had a brainstem abnormality based on a 50% to 90% variety of things, right? Well, I think in some cases that may be the best evidence there is, is the statistical data. In this case, it was one of several things. But in some cases, that may be the best evidence. And the sad truth is most SIDS autopsies are not performed in a way that will show any structural abnormalities. And in this case, and like a lot of cases, the brainstem isn't even a sample, let alone serially sampled. So, you know, in addition to that, a lot of times, even with appropriate sampling, a structural defect is not going to be evident. It's going to be a functional abnormality, which really, practically speaking, is only done in the research where they have the funding for those kind of methodologies. So the real tragedy, the problem is that you can't test it while the infant is still alive so that you can determine preventive measures. All right. Why don't we hear from the other side? Good morning, Your Honor. Good afternoon. May it please the Court. My name is Thomas Ward. I'm the Deputy Assistant Attorney General in the Civil Division for the Torts Branch. And I'd like to start by just expressing my sympathy for the family and the parents. Nobody can understand what a loss this is unless they've gone through it. And even though we disagree on the issues. Let me ask you a question about government policy in terms of administering the Vaccine Act. Where we see, we've seen other cases in which the reasons for an adverse infant reaction to a vaccine are getting to be better understood than they had been over history. And that it's been known statistically over the decades that a very small percentage, I think one half of 1% of infants will experience a dramatically adverse reaction to vaccine. And without being able to tell who in advance had either the genetic defect or the spinal or the defect that was found here by autopsy. And that the purpose of the statute was to accommodate that unknown or that propensity or that risk so that the national policy of vaccination of infants for the greater good, the greater public benefit would not be adversely affected. And what we see here and have seen recently elsewhere is as the reason is getting to be understood, we're told, well, it was this infant's destiny is the word that we've seen. And therefore, the Vaccine Act doesn't apply. But my understanding over the decades that we've been looking at these cases is that's directly contrary to the legislative purpose of the statute in the first place. Is this something on which the government or HHS or whoever it is that administers and sees all these cases is thinking about? Should there be additional pre-vaccination tests or analyses in order to accommodate the advances of science? Or where are we in terms of this administration? Because we read in the press that there are more and more agitation about infant vaccination just because there is still this real statistical, dramatically adverse reaction as here. If the infant dies, shows a reaction within hours and dies within the day, it's very hard to say there was no relationship. I'm sorry, is there a question in there? So in terms of your policy question, you know, the program is designed to compensate. Speak up a little, please. The program is designed to compensate fairly and efficiently. It's not designed to give away money when there is no scientific proof that an illness or death was caused by vaccines, as in this case. On pages 13. I'm sorry, Your Honor. On pages 13 to 17 of the red brief, you argue that under Moberly, a petitioner's theory of causation must be reputable. Yes, Your Honor. And that reputable evokes Daubert. You then argue that because the appellant's theory of causation fails under Daubert, it can't be reputable. That's a fair summation, is it not? Your Honor, Daubert is used as a way of analyzing. Are you arguing that under Moberly? It does not preclude reputability. When I talk, you don't. That's why I said you should be sorry. Now, are you arguing that under Moberly, the special master is required to consider the Daubert factors? I'm arguing that he may. Okay. That's fine. You've answered my question. On page 52 of the joint appendix. Yes, Your Honor. The Court of Federal Claims concluded that the special master's departure from the conclusions of four other special masters could only be explained by improper application of the standard of proof required in vaccine cases. And you make similar arguments on pages 18 to 23 of the red brief. What legal authority do you have holding that the decisions of those other special masters are binding in any way? They are not, Your Honor. They're persuasive. Does a failure to acknowledge or distinguish non-binding precedent render a decision arbitrary or capricious? By itself, Your Honor, no. Are you suggesting that these should be considered under Daubert? Yes, Your Honor. Okay. Tell me why. Because Daubert looks at whether there is acceptance in the scientific community. And it does not have to be complete. It does not have to be general. And so the analysis in the other opinions talk about the acceptance to any... I'm sorry, Your Honor. No, no. Go on. Daubert deals with scientific method analysis. Am I not correct? Correct. Part of that is an analysis... But then how does a special master's decision fall within a Daubert analysis? That's what I'm driving at. Now answer. Okay. The special master is allowed... They're not required, but they are allowed to look at the factors in Daubert to determine whether there is peer-reviewed... I mean, you know the factors better than anybody, Your Honor. But that's not... I agree. If you're looking at scientific evidence, that's fine. That's Daubert. But the special master is not a scientist, or I suppose could be. But what they're doing is not scientific analysis of the sort that falls within a Daubert analysis. No, but he's looking at how the expert is characterizing it.  And the special master is able to say, ask the expert, and see the attorneys ask the expert, has this been accepted anywhere else? And in this case, their expert, Dr. Miller, conceded that this theory that vaccines cause SIDS has not been accepted anywhere. And in fact, he said that he doesn't make it outside the vaccine program. He's been rejected... I'm sorry. That's Daubert. But what the special masters do is not Daubert. Acceptance within the scientific community is a Daubert factor. But I don't see how you can get what the court below said that, well, you have these special mastery decisions, and failure to abide by them is a Daubert violation. It just doesn't work. I think he's saying they're arbitrary and capricious. Yeah, okay, or that they are arbitrary and capricious. Which I do think is different, Your Honor. In her expert report, and at the entitlement hearing, Dr. McClusker opined that upper respiratory tract infections are a purely mechanical risk factor for SIDS. And on page 40 of the blue brief, the appellants assert that HHS did not provide any medical literature to support that opinion. Is there any medical literature in the record to support Dr. McClusker's opinion? I don't believe so, that that is a purely mechanical, Your Honor. Okay, on page 31 of the red brief, you argue it was clear error in judgment for the special master to give Dr. Miller's testimony greater weight than Dr. McClusker's because other special masters had found her to be credible. Is it the government's position that once an expert is found credible, their conclusions must be accepted by the court regardless of the other evidence on the record? In other cases? No, Your Honor, that is part of our argument. On page 25 of the joint appendix, the special master notes that Dr. McClusker had made misleading statements on the findings of two medical articles. And on page 27 of the joint appendix, he notes that she made assertions about JB's sleeping position and crib contents that were not supported by or were contrary to the record. And in fact, were contrary to the interview that was conducted five days afterwards where there was a reenactment involving the police. How does that impact your credibility argument for Dr. McClusker? Well, Your Honor, I think that you look at this as a whole. You're taking the special master's statements. Well, I'm taking his analysis. He's a finder of fact and a concluder of law. You're taking his analysis, and in addition to that analysis is the expertise that we have spelled out in our briefs. This case is effectively how cytokines work, and we have detailed extensively which of these experts is the expert on cytokines, and it is Dr. McClusker. It is not Dr. Miller. Yes, Your Honor. I'm sorry. I am interrupting, but I just wanted to follow up, and this was the question right before the last that Judge Wallach was asking about. You conceded that the respondent's expert, so it's the differentiation between the impact of the cytokines, right, whether or not it's a mechanical thing or whether it's a neurochemical thing. The other side tells me that Dr. Miller had plenty of scientific support for his theory, and you acknowledged a moment ago to Judge Wallach that your expert had no support for her theory. No, Your Honor. What the literature in the case record shows is that the appellants do not have any support for the theory that cytokines act in the way that they say they act. They do not cross the blood-brain barrier. All of the literature here talks about the expression of cytokines, their presence. None of it talks about their effect. There's a big difference on that. Now, what happens here is, and if I may say in passing so we don't forget it, Your Honor, McCusker did not concede there was a brain stem defect here. She was asked hypothetically, if Dr. Kinney's triple risk theory applied, what would it look like? She absolutely did not. The special master got that wrong. That's incredibly important because the case law Knudson and Hanlon in this court make clear that you cannot prove a central fact by statistical analysis. I hate to divert from our discussion of psychology, but let me just ask you about that. Was that discussed in the Court of Federal Claims when you appealed the special master of the Court of Federal Claims? Did you point out, is this something that if I go back and look in the record, you disputed it over time? Yes, Your Honor. And I don't know. Anyway, I ascribe no ill purpose to my brother on the other side, but it is factually incorrect that Dr. McCusker conceded that. Yes, please. And so the cytokines, basically how they work is in a child that has the brain stem defect, the 5HT, it basically is the door is closed. Imagine it as a door. And so the cytokines in the brain stem are knocking on the door and they can't open it. And so the cytokines, the way it works is that there may be more cytokines in that area, but they don't actually have any effect on the child who has the 5HT defect. The cytokines are basically there as the body's effort to solve this problem, which they cannot. It is not an additional causation that combines with the 5HT and then kills this child. I mean, this case is of monumental significance. And I don't know what your docket is, but it's certainly the most important case that I have a thousand cases in the torts branch, and this is the most important case. You know, this is, do vaccines cause SIDS? Full stop. Full stop. And the science is clear. They do not. They do not. And thankfully, the Court of Federal Claims and hopefully the Federal Circuit will reach the right decision before there is a national and worldwide panic for young parents on this. So can you tell us why your friend answered one question I had about the cytokines, saying that there was a lot of medical evidence on Dr. Miller's side as to how he said the reaction is. Their theory is a mild infection is linked to SIDS because of the neurochemical response to cytokines. Rather than purely the mechanical reasons, which was what your expert said. So tell me about that. What is the medical literature? Your Honor, I can go through. The answer is, as Dr. Miller conceded, there is no literature supporting his theory. He said in the hearing, I've connected the dots in a way that nobody else has, and nobody's done it outside the vaccine program. And so I can take you through every single one of his literature references and say why it doesn't apply. This is a, SIDS is an analysis of exclusion. I mean, we are looking at all of his literature. None of it supports that cytokines act in the way he says they act to cause SIDS and cause children to die. And now I'm happy to walk through each one of the literature and each case study to get there. And so that's it. I mean, if you take what the special master did here, and do not mistake length for rigor, is what he did is he allowed Dr. Miller to take a snippet from here, a snippet from there, and then come up with what he called a plausible mechanism. He called reasonable. There is no federal circuit opinion where reasonable is the standard. And in fact, in Moberly, this court rejected plausibility as the standard. It's simply not reputable. It's not sound science. This expert came up with a connecting dots theory that nobody else in the world has done. It's not peer reviewed. It is, there is this junk science of the first order that is incredibly dangerous. But isn't it even worse junk science to say because nobody knows why this infant, nobody knew in advance that this infant was going to have an adverse reaction. Therefore, the Vaccine Act provides no protection. Where is the sound science in that conclusion? Your presumption is faulty, Your Honor, I say respectfully, because the vaccine is, there is no proof that the vaccine caused this child to die of SIDS. We have... There's nothing that says that it didn't, that it didn't at least trigger the reaction. The response was just about instantaneous. It's very hard to say, and I don't think anyone did, that everything was just pure chance. Your Honor, the burden of proof is on the other side, because this is a non-table injury. Are you sure? I am absolutely sure, Your Honor. This is really what I was trying to explore in the beginning. When there is an instant adverse reaction, in this case, death, nonetheless, there is no presumption, no prima facie anything, no movement about, of the burdens. Correct. Correct. The only... would say that you must, you must prove, if you're able to prove that there was a relationship in advance, you'd test the infant, and if the infant has the propensity that it will instantly die and be called SIDS, it means you don't know why the infant died. So, you would at least attempt to discover in advance that this is the situation you're going to encounter. Your Honor, you can't. You'd have to cut the child open. You cannot determine in advance a brainstem defect without autopsying the child. Exactly. That's what this whole statute, as I understood it, was about. No, Your Honor. You can't tell in advance. Therefore, you need at least enough of a safeguard that you don't adversely infect the national policy of vaccines, which I think everyone agrees are very important. No, Your Honor. There are table injuries and non-table injuries. When it's a table injury, the government has the burden of proof to prove by reputable, sound, and reliable medical or scientific evidence that the vaccine did not cause the injury. When it's a non-table injury, the petitioners have the exact result. I think even now, since no one knows what the cause is, we still have, unfortunately, an unknown sudden death of the infant. And when that follows, within hours or less, the administration of the vaccine, is it still unknown? Yes, Your Honor. There is no scientific evidence to prove that vaccines cause SIDS. None. Zero. Precisely. That's the problem. That's why the statute was enacted. Because you couldn't prove it either way. I'm not saying either way. There is no scientific evidence that vaccines cause SIDS. I want to be absolutely clear on that for both this court and for the population at large. There is no scientific evidence that vaccines cause SIDS. The petitioners have the burden to prove otherwise by reputable, sound, and reliable scientific or medical evidence. They have not. Each one of the articles they put forth, each of the case studies, which are the lowest form of scientific evidence, are all easily distinguishable in that cytokines do not act the way Dr. Miller says they act. Cytokines aren't in the statute. Say that again, please, Your Honor. Cytokines aren't mentioned in the statute. As the science is evolving, why there is this adverse reaction is starting to be understood. I agree with that. Okay. I didn't want to take us down that path. All right. Any final word? You've exhausted your time. I could keep going if you'd like. That's okay. Thank you. Thank you, Your Honor. You've got a little rebuttal time. I just have a couple points I want to address. Can I just add, and I won't take this out of your time, but just one quick clarification because I do think it's a very key point. Your friend tells us that there was no concession by the other side on this brain abnormality thing and that they pressed that at the court of claims or whatever. Do you have a disagreement with anything he said about that? Personally, I do believe it was a concession, and the special master believed it was a concession as well. I think the question isn't whether we believe it was a concession, but whether it was rational for the special master to find that it was a concession based on her testimony. Okay. I'm sorry to take your time. Go ahead. I just wanted to address a couple things. The respondent mentioned that the vaccine program is not designed to give money when there's no scientific proof of injury, but that's not the standard in the Vaccine Act standard. Scientific certainty is not the standard. It's preponderance of the evidence. He also, respondent, mentioned that there was no literature that cytokines cross the blood-brain barrier and that there's no literature, and all the literature deals with cytokine expression, and neither of those things is true. That's what I wanted an answer on. It's almost ubiquitous in the literature that cytokines from a peripheral insult, including infection, vaccination, can and do cross the blood-brain barrier. In fact, there's direct evidence in this case that that did happen. There is a great deal of literature in this case that deals with cytokine expression, but there's also a great deal of literature that deals with the function of those cytokines when they are in the central nervous system and interact with neurons in the brainstem. And that literature is in the form of animal studies and in vitro studies. Stoltenberg, Frone, and Brambilla show that cytokines such as IL-1, when they interact with 5HG neurons in the brainstem, they can cause prolonged apneas and interferolateral resuscitation. So there is the literature that deals with the expression of cytokines in these areas of the brain, and also that deals with the function of these cytokines. There's a record site on those plays. So the Frone article is at appendix 736 through 740. If you want it, I have it. If you have it, sure. Brambilla is appendix 600 to 607. And then Stoltenberg. I'm not sure Stoltenberg is part of the appendix. But there is an additional article Stoltenberg as well. It's similar to the Frone article. And they deal with cytokine function. Thank you. So I also just want to point out, in this case, JB also had a post-vaccinal fever, which is its own exogenous risk factor. And it's also a good example of how mild it is. I thought your position was that the fever, or Dr. Miller's position was that the fever was not dispositive or even relevant. I think the fever, there are two reasons the fever is important. First, it's its own separate exogenous risk factor and also provides direct evidence that the vaccine, secondary to the vaccination, did cross the blood-brain barrier and interacted with neurons in JB's brain. Both points that Dr. McCusker agreed with as well. So post-vaccinal fever is also mentioned in literature as an exogenous risk factor. And it's a good example of how mild infection or an inflammatory insult can operate as a neurochemical risk factor. As elevated temperature has been shown to prolong apneas and interfere with auto-resuscitation. And even mild infection can increase CO2 levels in infants under three months of age. And those increases in CO2 levels is shown in literature, in some animal studies, to be the result of the cytokines secondary to the infection. Thank you. We thank both sides. The case is submitted. That concludes our proceedings.